## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **SUSAN BLOOM**, *et al.*,<br><br>Plaintiffs,<br><br>*v.*<br><br>**MEDICAL DEPOT, INC.**, *also known as DRIVE MEDICAL, doing business as DRIVE DEVILBISS HEALTHCARE*,<br><br>Defendant. | **CIVIL ACTION**<br><br>**NO. 24-1783-KSM** |

### <u>MEMORANDUM</u>

**Marston, J.**                                        **September 30, 2025**

Plaintiff Susan Bloom was sitting on a Rollator walker marketed and sold by Defendant Medical Depot, Inc. when the walker's left front wheel broke, causing Bloom to fall to the ground and injure her right shoulder.  Bloom now brings product liability claims against Medical Depot, Inc., doing business as Drive Devilbiss Healthcare ("Drive"),[1] and in support of those claims, puts forth the opinions of two experts, liability expert, Francesca Cibotti, and medical expert, Charles J. Odgers IV, M.D.  (Doc. No. 1-1.)  Drive moves to exclude the opinions of each expert and for summary judgment on all of Bloom's claims.  (Doc. Nos. 34, 35, 37–40.)  For the reasons discussed below, Drive's motions are denied.

---

[1] The Complaint also identifies Bloom's husband, Aram Bloom, as a Plaintiff in this action; however, no claims are asserted on his behalf.  (*See generally* Doc. No. 1-1.)

## I.    FACTUAL BACKGROUND[2]

Susan Bloom is a 68-year-old, right-handed female.  (Doc. No. 39-2 at 2.)  She worked full-time as an occupational therapist until April 28, 2020, when, while leaving a patient's home, she fell and injured both of her ankles.  (Doc. No. 47 at ¶ 1; Doc. No. 36-3 at 10:3–12, 11:2–5 ("Bloom Dep. Tr."); *see also* Doc. No. 36-2 (Employer's Report of Occupational Injury or Disease).)  Bloom initiated a workers' compensation claim and was placed on total disability.  (Bloom Dep. Tr. at 10:16–22; *see also* Doc. No. 36-4 (Bloom's medical records for ankle injuries).)  Her employer's workers' compensation coverage provided for medical costs and indemnity benefits, meaning Bloom was paid a wage rate for the time she was unable to work.  (Bloom Dep. Tr. at 15:5–20.)

---

[2] For purposes of this motion, the Court views the evidence in the light most favorable to Bloom as the nonmovant.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Drive argues that in doing so, we should look no further than the statement of facts it submitted with its motion (Doc. No. 46) because the facts listed within it are "undisputed as Plaintiffs failed to file a timely response to Drive's submitted Statement." (Doc. No. 49 at 4.)  But as Drive acknowledges, the Court entered an Order *sua sponte* briefly extending the deadline for Bloom to submit her opposition, and Bloom complied with that Order.  (Doc. Nos. 46, 47.)  *Cf. Brown v. City of Philadelphia*, 541 F. Supp. 3d 605, 613–14 & n.5 (E.D. Pa. 2021) (striking the plaintiff's opposition to the defendant's statement of undisputed facts because it was filed "well past the Court-ordered deadline and without any acknowledgment of [its] tardiness," and it was not the first time counsel failed to comply with Court deadlines).  Drive argues that the Court should nevertheless disregard Bloom's opposition because to the extent Bloom does dispute any specific statement of fact, her "'disputes' are not credible at all." (Doc. No. 49 at 6.)  This argument fails because at summary judgment, it is not for the Court to make credibility decisions.  *Savage v. Judge*, 644 F. Supp. 2d 550, 559 (E.D. Pa. 2009) ("It is not the function of this Court to make credibility determinations or resolve factual disputes when ruling on a motion for summary judgment.").  Last, Drive argues that the Court should disregard Bloom's "Counter Statement of Material Facts" in her opposition brief because any alternative facts should have been separately submitted per the undersigned's policies and procedures.  (Doc. No. 49 at 6); *see* J. Marston Policies & Procedures at 9 ("The respondent shall also set forth, in separate numbered paragraphs, each additional fact which the respondent contends precludes summary judgment and share a word version with the movant and the movant shall respond thereto following the same procedure outlined herein.").  Drive is correct that Bloom failed to comply with the policies and procedures, a fact that certainly concerns the Court.  Nevertheless, we do not find it appropriate to consider Drive's statement of facts undisputed, especially when many of Bloom's alternative facts are included in her opposition to Drive's statement (*see* Doc. No. 47) and show there are clear disputes of fact in this record.

### A.    The Rollator Walker

As part of her medical coverage, the workers' compensation provider purchased Bloom a Rollator walker sold by Drive.  (*Id.* at 34:6–14.)  The walker appeared at Bloom's door in a Drive-branded box, and Bloom unpacked and assembled it herself.  (*Id.* at 35:6–36:9.)  Because of her training as an occupational therapist, Bloom was familiar with the Rollator walker and knew how to properly assemble and use it.  (*Id.*)  Once assembled, the walker had two handles, a padded seat, and four wheels, which could be locked when the user wished to sit down:



(Doc. No. 37-2 at 6.)

Inside the box with the walker was a hang tag which included the walker's assembly instructions, safety precautions, operation and maintenance instructions, and the warranty for the product.  (Doc. No. 47 at ¶¶ 14–15.)  The safety precautions included a warning for users to "[a]lways lock loop locks before sitting and do not use seat when unit is on an incline or uneven ground."  (*Id.* ¶ 16.)  From April 2020 to April 2022, Bloom used the walker without incident,

relying on it when walking long distances or standing for extended periods of time. (Bloom Dep. Tr. at 41:12–19, 42:14–17.)

### B.    The Cruise

In April 2022, Bloom traveled on a cruise with her sister, Joni Stutman. (Doc. No. 47 at ¶ 17.) Bloom took the Rollator walker with her on the cruise, using it when she walked across the ship and when she participated in shore excursions. For one such excursion, Bloom and Stutman went to a botanical garden in Curaçao, where they toured the garden with a local guide. (*Id.* at ¶ 18; Bloom Dep. Tr. at 66:6–11.) The tour consisted of walking along a natural path made of dirt with stones and gravel on the surface. (Bloom Dep. Tr. at 72:14–73:12.) Every few feet, the group would stop so that the guide could describe the plants or the history of the garden, and during those times, Bloom would lock the wheels on her walker and use it as a seat. (*Id.*; *see also id.* at 78:15–79:25 (testifying that she always properly aligned the wheels and locked the brakes before sitting on the walker).) Although portions of the path were uneven and/or slightly sloped, Bloom testified that she "would not have been walking on or sitting on the uneven parts," but instead, would follow the flattest portion of the path and pause on level ground. (*Id.* at 76:9–22; *see also id.* at 77:12–17 ("[W]hen I walked with my walker, I take the path of least resistance. I will not go in a straight line just because it's a straight line. I will go where it's the most level and most even, and I would not sit on a place that was uneven and rocky.").)

About halfway through the tour, Bloom was sitting on the walker listening to the guide discuss the difference between agave and aloe when the wheel fork[3] broke on the walker's left front wheel. (Doc. No. 47 at ¶ 22.) Bloom pitched to the right, falling on her right shoulder and

---

[3] The wheel fork is the component that holds the wheel in place and connects the wheel to the frame of the walker.

hip with the walker on top of her.  (Bloom Dep. Tr. at 82:4–83:23.)  She felt an immediate sharp, stabbing pain in her shoulder and throbbing in her hip.  (*Id.* at 87:25–88:9; *id*. at 89:13–14.)  Once Bloom was able to stand, she was taken to a separate area to rest while the rest of the group finished the tour.  (*Id.* at 85:5–19.)

When Bloom and Stutman returned to the cruise ship, they went to the on-ship medical center where the physician took x-rays to confirm Bloom's shoulder was not broken.  (Doc. No. 47 at ¶ 23; Bloom Dep. Tr. at 91:17–20.)  The doctor gave Bloom Tylenol and a sling and told her to ice her shoulder until she returned home, at which point she should have it looked at again.  (Bloom Dep. Tr. at 91:19–92:18.)  Because her walker was broken, Bloom was also given a wheelchair to use for the rest of the cruise.  (*Id.* at 92:1–22.)

While they were in the medical bay, Stutman completed a form Guest Injury Statement on Bloom's behalf.  (Doc. No. 47 at ¶ 24; Doc. No. 36-10.)  On the form, Stutman recounted the incident, noting that Bloom was "sitting on [the] rollator on [a] gravel path" when the walker's "left front wheel just collapsed" and Bloom "fell on [her] arm (right) and hip."  (Doc. No. 36-10 at 3.)  When asked, "What do you believe caused this incident?," Stutman wrote, "uneven gravel path possibly caused wheel to be crooked and broke under weight."  (*Id.*)

### C.    Medical Treatment for a Torn Rotator Cuff

A little less than a week later, Bloom returned home and went to an orthopedic urgent care center.  (Bloom Dep. Tr. at 106:19–21.)  The center confirmed that her shoulder was not broken, and she was referred for an MRI.  (Doc. No. 36-16 at 1 ("Odgers Rpt.").)  On April 29, 2022, Bloom met with Dr. Odgers for the first time, and he diagnosed her with a full-thickness rotator cuff tear of her right shoulder.  (*Id.* at 2–3.)  Around a month later, Dr. Odgers performed a right shoulder arthroscopic rotator cuff repair, labral debridement, subacromial bursectomy and open subpectoral bicep tenodesis.  (*Id.* at 3.)  During the surgery Dr. Odgers noted that Bloom's

"tissue quality was poor," which placed the "repair under more tension." (*Id.*) But ultimately, he believed Bloom "tolerated the procedure well." (*Id.*)

In the weeks that followed, Bloom continued to experience pain in her shoulder and bicep. (*Id.* at 3–4.) When the pain persisted at her 14-week postoperative visit on August 29, 2022, Dr. Odgers performed functional testing which revealed a lag in her external rotation, which was "concerning for failed healing of the rotator cuff tear." (*Id.* at 4.) He referred Bloom for another MRI of her right shoulder, which was performed on September 6, 2022 and revealed "a large supraspinatus and infraspinatus tear with 4cm of retraction and moderate to severe muscle atrophy." (*Id.* at 5.) Given the size of the tear and the corresponding muscle atrophy, Dr. Odgers did not recommend that Bloom undergo another surgery to repair the rotator cuff. (*Id.*) Instead, he recommended that she continue physical therapy and if her pain persisted, he "discussed the possible need for reverse total shoulder arthroplasty at a future date." (*Id.*)

Bloom continued physical therapy but eventually discontinued it when her shoulder did not improve. (*Id.*) At her final postoperative visit on December 12, 2022, Dr. Odgers recommended that she be discharged to a home exercise program and again discussed the "risks and benefits of a reverse total shoulder arthroplasty if her right shoulder symptoms of weakness and pain worsened." (*Id.*) Bloom indicated that she was not interested in undergoing surgery at that time (*id.*), but she has since testified that she intends to move forward with the surgery once she turns 70 as her pain and range of motion have not improved since she last saw Dr. Odgers in December 2022 (*see* Bloom Dep. Tr. at 120:4–19).

### D. Workers' Compensation Petitions and Settlement

While Bloom was treating her shoulder injury from April to December 2022, the workers' compensation proceeding continued as to her ankle injuries. Of note, in January 2023 the workers' compensation coverage provider moved to suspend the payment of her wage loss

benefits on the grounds that a medical evaluation from November 2022 supported a finding that Bloom was recovered from her ankle injuries and there was "no need for further treatment regarding [her] ankles." (Doc. No. 36-5 at 2, 17–18.)  Bloom opposed the motion, and in a letter to the workers' compensation judge stated that she "only wish[ed] that were the case." (*Id.* at 2–3.)  She noted that she "ha[s] not been the same" since she injured her ankles and requested that benefits continue as she was "financially dependent on" them. (*Id.*)  Around the same time, Bloom also petitioned the workers' compensation judge to "amend the description of injury" in that action to include her shoulder injury. (*See id.* at 19–24.)[4]  The workers' compensation judge ultimately denied the request to suspend payment of wage loss benefits. (*Id.* at 28.)  Although the cover letter to the judge's order states that he was also ruling on Bloom's request to amend the description of injury (*id.* at 27), the text of the order said nothing as to her request (*id.* at 28).

On September 13, 2023, Bloom and the workers' compensation provider entered a Compromise and Release Agreement (the "C&R"). (Doc. No. 36-6.)  The provider agreed to pay a lump sum—$180,000, plus all "reasonable and necessary medical expenses related to the April 28, 2020 work injury for medical treatment incurred between the date of the injury and September 13, 2023"—to resolve all wage loss and medical benefits arising from Bloom's ankle injuries. (*Id.* at 2–3.)  The C&R explains that the "sum of $180,000 represents payment of all future workers' compensation wage indemnity claims as compensation for impairment of [Bloom's] remaining lifetime earning power." (*Id.* at 3.)  The parties agreed that this payment was "solely a settlement of Claimant's workers' compensation matter and is not to be construed

---

[4] During her deposition, Bloom testified that she believed it was appropriate to add her shoulder injury because the workers' compensation provider ordered her the Rollator walker. (Bloom Dep. Tr. at 30:20–31:13 ("I thought since Workers' Comp brought me the walker and the walker broke and injured me, that that should be part of the Worman's Comp.").)

as a resolution or release of any other claims." (*Id.*; *see also id.* at 6 ("It is the expressed intention of this agreement that the language herein shall not affect, be relevant to, limit the scope or reduce damage claims, or prejudice, in any manner, claimant's third party claims brought by or on behalf of claimant . . . .").)

As for Bloom's outstanding shoulder injury, the parties requested that her pending petition to amend the description of injury "remain pending and be decided by [the workers' compensation judge] on the merits upon the evidence of record" with briefs to "be submitted." (*Id.* at 4.) The record before the Court does not disclose whether the workers' compensation judge resolved this issue.

## II.    PROCEDURAL HISTORY

In March 2024, Bloom filed this product liability action against Drive in Pennsylvania state court. (*See* Doc. No. 1-1.) The Complaint asserts five causes of action under Pennsylvania law: (1) negligence, (2) strict liability, (3) failure to warn, (4) defective design, and (5) breach of warranties. (*Id.*) Drive removed the matter to this Court in April 2024, and the parties proceeded with discovery. (Doc. No. 1.)

In February 2025, Drive moved for summary judgment, arguing that it is entitled to judgment in its favor on all of Bloom's claims. (Doc. Nos. 34, 35.) Drive simultaneously moved to exclude the opinions of Bloom's liability expert, Francesca Cibotti, (Doc. Nos. 37, 38) and moved to partially exclude the opinions of Bloom's medical expert, Dr. Charles Odgers, (Doc. Nos. 39, 40). Bloom opposes all three motions. (*See* Doc. Nos. 43–45.) The Court addresses Drive's motions to exclude before turning to the motion for summary judgment.

### III.    MOTIONS TO EXCLUDE EXPERT OPINIONS

Drive argues that Ms. Cibotti's and Dr. Odgers's opinions are inadmissible under Federal Rule of Evidence 702 and the United States Supreme Court's opinion in *Daubert v. Merrell Down Pharms., Inc.*, 509 U.S. 579, 591 (1993).

### A.    Legal Standard

Federal Rule of Evidence 702 outlines the conditions that must be met for a witness to testify as an expert:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  This rule requires the trial judge to act as a "gatekeeper," ensuring that "any and all expert testimony or evidence is not only relevant, but also reliable."  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (cleaned up); *see also Sikkelee v. Precision Airmotive Corp.*, No. 4:07-CV-00886, 2021 WL 392101, at *2 (M.D. Pa. Feb. 4, 2021) ("A district court exercises more control over experts than over lay witnesses," because "expert evidence can be both powerful and quite misleading" given "the difficulty in evaluating it." (quotation marks omitted)).  "*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but

also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

To be admissible under Rule 702, expert testimony must satisfy "three major requirements:  (1) the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda*, 520 F.3d at 244.  These factors are often referred to as "qualification," "reliability," and "fit."  *See Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) ("We have explained that Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit.").

"Qualification requires that the witness possess specialized expertise." *Pineda*, 520 F.3d at 244 (cleaned up).  The Third Circuit has counseled that "a broad range of knowledge, skills, and training qualify an expert." *Id.*; *accord Schneider ex rel. Schneider*, 320 F.3d at 404; *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994).  Under the reliability prong, an "expert's testimony is admissible so long as the process or technique the expert used in forming the opinion is reliable." *Pineda*, 520 F.3d at 247 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 742).  In other words, the proffered testimony "must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation" and the "expert must have good grounds for his or her belief." *Schneider ex rel. Schneider*, 320 F.3d at 404 (cleaned up).  The Third Circuit has identified eight factors that may be relevant to the reliability analysis:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the

> qualifications of the expert witness testifying based on the
> methodology; and (8) the non-judicial uses to which the method has
> been put.

*In re Paoli*, 35 F.3d at 742 n.8.  Last, the "expert testimony must fit the issues in the case,"

meaning the "expert's testimony must be relevant for the purposes of the case and must assist the

trier of fact."  *Id.*; *see also Daubert*, 509 U.S. at 591 ("Fit is not always obvious, and scientific

validity for one purpose is not necessarily scientific validity for other, unrelated purposes.").

The party proposing the expert witness must show that each prong—qualification,

reliability, and fit—is satisfied by a preponderance of proof.  *Oddi v. Ford Motor Co.*, 234 F.3d

136, 144 (3d Cir. 2000); *see also In re Paoli*, 35 F.3d at 743 & 744 n.11 (explaining that the

proponent must make more than a *prima facie* showing that a technique is reliable); *Ellison v.*

*United States*, 753 F. Supp. 2d 468, 476 (E.D. Pa. 2010) ("The burden is on the proponent of the

evidence—here the plaintiff—to establish admissibility by a preponderance of the evidence.").

However, at all times, we must remember that the Federal Rules of Evidence generally "embody

a strong preference for admitting any evidence that may assist the trier of fact," and Rule 702

specifically has a "liberal standard of admissibility."  *United States v. Downing*, 753 F.2d 1224,

1230 (3d Cir. 1985); *see also Oddi*, 234 F.3d at 156 ("The test is not whether the expert might

have done a better job." (cleaned up)).[5]

With this standard in mind, the Court addresses the motions to exclude the opinions of

Ms. Cibotti and Dr. Odgers in turn.[6]

---

[5] Drive argues in its reply brief that the 2023 amendments to Rule 702 abrogate the "liberal standard of admissibility" previously applied to expert testimony.  (Doc. No. 48 at 4.)  Drive cites no authority in support of this bold assertion, and a review of recent case law—including one recent, published Third Circuit opinion—refutes it.  *See, e.g.*, *Secretary, U.S. Dep't of Labor v. Nursing Home Care Mgmt. Inc.*, 128 F.4th 146, 162 (3d Cir. 2025) ("Though the burden is on the proponent, we have said 'Rule 702 has a liberal policy of admissibility.'" (quoting *Pineda*, 520 F.3d at 243)).

[6] Neither party has requested an evidentiary hearing on the motions to exclude, and the Court finds no such hearing is needed, because the Court can decide the motions based on the expert reports and

### B.     Ms. Cibotti's Qualifications and Opinions

Francesca Cibotti is a materials scientist.  (Doc. No. 45-2; *see also* Doc. No. 37-4 at

9:24–25 ("Cibotti Dep. Tr.") ("I'm a materials engineering and failure analysis expert.").)  In

2015, she received a Bachelor of Science in Materials Science and Engineering with a

concentration in metals from the University of Florida.  (*Id.* at 4; *see also* Cibotti Dep. Tr. at

16:6–15.)  After graduation, she worked at Chevron and Apple in various project manager

positions that focused on product failure analysis before she transferred to her current role at

Robson Forensic, Inc., where her responsibilities again focus on "the resolution of material

failures."  (*See* Doc. No. 45-2 at 1–3.)

Bloom hired Ms. Cibotti to investigate her Rollator walker and "determine the

mechanism of failure" for the left front wheel, and in particular, analyze whether "the design of

the [walker's wheel] fork contributed to the incident."  (Doc. No. 37-2 at 3 ("Cibotti Initial

Rpt.").)  Ms. Cibotti was also asked to consider whether an "alternative design existed that would

have prevented the fork failure and Ms. Bloom's fall and injury."  (*Id.*)

To answer these questions, Ms. Cibotti visually inspected the walker and the broken

wheel fork at a macro- and microscopic level.  (*Id.* at 5–14.)  She then issued her initial expert

report on November 20, 2024, in which she concludes that the wheel fork "component failed due

to progressive cracking from cyclic loading" (i.e., pressure every time Bloom used and pushed

down on the walker) and that a "more robust [wheel fork] design would have prevented the fork

---

deposition transcripts submitted by the parties.  *See, e.g.*, *Kerrigan v. Maxon Indus.*, 223 F. Supp. 2d 626,
634 (E.D. Pa. 2002) ("Unlike the 'scant' record before the court in *Padillas*, the record here clearly lays
out [the expert's] background, training and experience such that this Court can reach a conclusion
regarding his qualifications, and sufficiently and clearly explicates his conclusions and the bases for his
opinions such that this Court can judge the reliability of his opinions.  We decline to hold a *Daubert*
hearing and will proceed to decide the merits of Defendant's motion based on the written record before
us.").

from failing in this incident." (*Id.* at 24–25.) Ms. Cibotti also opines that defects in the material used for Bloom's specific wheel fork—a glass-filled nylon 6 polymer—contributed to its failure. (Cibotti Dep. Tr. at 45:3–7, 48:13–18.) In addition to her design and manufacturing opinions, Ms. Cibotti opines that the walker's warnings and instructions are insufficient because they identify 300lbs as the walker's weight limit, but that limit is not supported by documentation or testing and is contradicted by consumer reviews, which suggest other users experienced failures similar to Bloom's. (*Id.* at 23, 25.) Those warnings and instructions also fail to identify the useful life of the walker and to explain what is meant by the phrase "uneven ground." (*Id.*)

On December 6, 2024, Ms. Cibotti issued a supplemental report. (Doc. No. 37-3 ("Cibotti Supp. Rpt.").) In it, she considers whether additional materials—including Bloom's deposition; Stutman's deposition; and the report of Drive's engineering expert, Pierce Umberger, Ph.D., P.E.[7]—alter her conclusions. (*Id.* at 3.) After considering these additional materials, Ms. Cibotti maintains her opinion that the wheel fork's design in combination with the defects in the nylon 6 polymer caused the incident. (*Id.* at 3–8.) She disputes Dr. Umberger's contrary conclusion that Bloom's use of the walker on an uneven surface actually caused the wheel to be crooked and break under her weight. (*Id.* at 7–9.) Ms. Cibotti references the deposition testimony of Bloom and Stutman, which show the path "was neither hilly nor rocky," and she discusses a study, where the researchers performed a "meta-analysis of injuries associated with walking aids" and found that "critical component breakage and design failures," *not* uneven surface handling, were the "most frequently encountered device failure mechanisms." (*Id.* at 7–8.)

---

[7] This report has not been provided to the Court.

Drive now moves to exclude Ms. Cibotti's opinions in their entirety, arguing that she is unqualified and that her opinions are unreliable.  The Court addresses each issue in turn.

### 1.    <u>Qualifications</u>

First, Drive argues that Ms. Cibotti is unqualified to offer her opinions because she testified that "she is not an expert in biomechanics, human factors, warnings, medical device safety, injection molding, medical devices generally, durable medical equipment, or design." (Doc. No. 38 at 7–9.)  But as Bloom notes in her response, this argument ignores the fact that the areas in which Ms. Cibotti *is* qualified render her more than appropriate to give expert opinions in this case.

As noted previously, the Third Circuit liberally interprets Rule 702's qualifications requirement and has "eshewed imposing overly rigorous requirements of expertise."  *In re Paoli*, 35 F.3d at 741.  "[A] broad range of knowledge, skills, and training qualify an expert as such," *id.*, and it is an "abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate," *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996); *accord Pineda*, 520 F.3d at 244.

Here, Ms. Cibotti has a Bachelor of Science in Materials Science and Engineering, and she has spent the last decade working in various product management roles that focused on failure analysis of hundreds of industrial and commercial products.  (Doc. No. 45-2; Cibotti Initial Rpt. at 3.)  In those roles, she "frequently utilized" the same laboratory tests and analytical techniques that she used in this case "to characterize the failed material in support of root cause analysis."  (*Id.*)  Drive attacks this experience, arguing that it was limited to "working on Apple products, such as electronics, cables, and chargers" and to "investigating refining operations, such as piping, pressure vessels, and welds," not analyzing medical device failures.  (Doc. No.

38 at 9.)  Drive, citing *Kerrigan v. Maxon Industries*, 223 F. Supp. 2d 626 (E.D. Pa. 2002),

reasons that Ms. Cibotti should, therefore, be "precluded from offering her opinions on the

manufacture, design, any proposed alternative design, and the warnings of the Rollator."  (*Id.*)

       *Kerrigan* is distinguishable.  In that case, the plaintiff was injured while driving a cement

truck when the barrel portion of the cement mixer, known as an agitator, inadvertently rose and

struck a bridge overpass.  223 F. Supp. 2d at 630.  The plaintiff sued the company that

manufactured the agitator and the company that mounted it on the truck's cab and chassis.  *Id.*

During litigation, the plaintiff hired an expert, who opined that the truck's "agitator was

defectively designed" because it lacked necessary safety features, including "a valve that would

have enable[d] the fluid supply to the elevation control to be shut down while the vehicle was in

operation and/or a light and alarm warning system that would have warned the driver that the

agitator was rising while the vehicle was in motion.  *Id.* at 634.  The defense argued that the

expert was unqualified, and the court agreed.  *Id.* at 635–37, 639.  The expert had no educational

experience in product engineering and design or in equipment safety.  *Id.* at 635.  And although

he had "practical experience" in "[s]pecialized machinery placement in-shop movement,"

"[h]eavy truck bed and wrecker installation," and "[h]eavy truck maintenance and repair," that

practical experience did not render him capable of explaining to the jury how his proposed safety

features would work as part of the truck's entire hydraulic system:

> We agree with Defendant that [the expert's] understanding of the
> principles of mechanics involved in the use of the power take-off
> attached to the engine, and its connection with the hydraulic
> equipment does not establish his ability to testify as to the design
> and implementation of the proposed hydraulic line safety device and
> is not sufficient to qualify him to offer an expert opinion in this area.
>
> . . . .

> As with the proposed shut off valve, we find that in order for an
> expert to be qualified to testify as to the function and design of the
> proposed warning system, the witness would have to have hydraulic
> engineering and design experience. Without such experience, the
> witness would not be qualified to explain how the warning system
> would work in conjunction with the hydraulically operated agitator.

*Id.* at 636–39. Accordingly, the court excluded the proposed expert's opinion on these topics and

informed the plaintiff that any future expert offering similar opinions would have to have

"product design experience." *Id.* at 637.

As this summary shows, the expert in *Kerrigan* lacked the educational and practical

experience needed to explain how his proposed safety changes—the addition of a safety valve

and/or warning light and alarm—would be integrated into the truck's existing hydraulic system.

Here, by contrast, Ms. Cibotti is more than qualified to explain to the jury how defects in the

nylon 6 polymer used for the wheel fork, along with its shape, caused it to fail. She not only has

a bachelor's degree in Materials Science and Engineering, but she also has a decade of practical

experience investigating materials failures on a variety of products, including consumer products

and products made with polymers, like the injection-molded, glass-filled nylon 6 polymer used

on the wheel fork in this case. (*See* Doc. No. 45-2; Cibotti Dep. Tr. at 20:21–24 (testifying that

while at Apple, she "analyzed several nylon failures of different components ranging from

wristbands for the Apple Watch to internal components of the electronics"); *id.* at 26:11–19

("Q. [ ] So have you worked for Robson on any case involving a glass-filled polymer product?

A. Yes."); *id.* at 53:18–23 (testifying that while at Apple, she "performed a failure analysis on an

injection-molded polymer product").) Tellingly, in those roles, she has led more than 200 failure

analysis investigations using the same analytical techniques and tests that she used to analyze the

wheel fork in this case. (Doc. No. 45-2 at 1; Cibotti Initial Rpt. at 3.) There is nothing to

suggest that she is unqualified to opine about the cause of the wheel fork's design, manufacture, and warnings simply because it was part of a medical device, as opposed to an Apple accessory.

Given Ms. Cibotti's experience, the Court finds that under the Third Circuit's liberal standard governing qualifications, she is qualified to opine about the wheel fork's composition, design, and manufacture, as well as what caused it to fail and how a different design or warning could have prevented Bloom's accident. *See Pineda v. Ford Motor Co.*, 520 F.3d 237, 245 (3d Cir. 2008) (finding the plaintiff's materials engineer was qualified to testify about warnings and procedures that should have been included in an automobile service manual because: (1) the expert "did not need to be substantively qualified in the design of automobile rear liftgates or the drafting of service manual instructions. [His] expertise in the stresses and other forces that might cause a material such as glass to fail was more than sufficient to satisfy Rule 702's substantive qualification requirement," and (2) "a proper warning is also a solution to an engineering problem"); *cf. Holbrook*, 80 F.3d at 782 ("The court's mistaken approach restricted Dr. Carpenter's testimony based on a requirement that the witness practice a particular specialty to testify concerning certain matters. In light of our liberal standard governing the qualifications of a proffered expert witness, and our acceptance of more general qualifications, we hold that the district court erred by finding that Dr. Carpenter was not qualified to render a diagnosis or to discuss the pathology report because he was not a pathologist, oncologist or expert in 'definitive cancer diagnosis.'").

### 2.  **Reliability**

Drive also moves to exclude Ms. Cibotti's opinions as unreliable. As noted above, under the reliability prong, an "expert's testimony is admissible so long as the process or technique the expert used in forming the opinion is reliable." *Pineda*, 520 F.3d at 247 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 742). Drive challenges Ms. Cibotti's opinions about the wheel

fork's design, the wheel fork's manufacture, and the walker's warnings and instructions. (Doc. No. 38 at 10–14.) The court addresses each argument in turn.

***The Wheel Fork's Design.*** First, Drive argues that Ms. Cibotti should be precluded from offering opinions about the wheel fork's design and the feasibility of safer alternative designs because she has not identified any specific defect in the design of the walker's wheel fork, but instead, generally opines that a "more durable material or a more robust design would have prevented the fork from failing in this incident" and that "safer alternative designs were technologically feasible" and "would have prevented the fork failure." (Doc. No. 38 at 11–12.) Drive also argues that Ms. Cibotti has failed to "suggest any purported feasible alternative design for the wheel fork or any other component of the Rollator." (*Id*.) The Court disagrees.

Ms. Cibotti opines that the wheel fork was defectively designed because it contained a geometry change in the nature of a semi-circular stress concentration that reduced the fatigue life of the wheel fork, and which, in combination with manufacturing defects in the nylon 6 polymer, caused the component to break. (Doc. No. 45-1 at 10; *see also* Cibotti Dep. Tr. at 83:7–11.) In support of this opinion, she testified that it is "well known in the materials science and engineering community that abrupt changes in geometry are stress concentrations which are the weakest points in a component." (Cibotti Dep. Tr. at 44:9–13.) Drive has not challenged that assertion, and nothing in the current record suggests it is incorrect.

Instead, Drive suggests Ms. Cibotti's opinion about the wheel fork's design is unreliable because she failed to identify a feasible alternative to the inclusion of a geometric shift. But Ms. Cibotti did identify an alternative design. In her initial report, she explains that a "*smoother geometry* would reduce the concentration of stress at this part of the fork component." (Cibotti Initial Rpt. at 24 (emphasis added).) And in her deposition, she testified that Drive's "Durable

Rollator Walker" has a wheel fork with a "completely different design" that represents a feasible alternative.  (Cibotti Dep. Tr. at 84:4–15.)

Drive, citing *Rossano v. Maxon*, 659 F. Supp. 3d 559 (E.D. Pa. 2023), and similar cases, argues that Ms. Cibotti should be foreclosed from discussing potential alternative designs because she has not tested whether they would have prevented Bloom's accident.  Drive is correct that "[c]ourts generally look for alternative design experts to provide evidence of calculations, diagrams, or tests to support their opinions."  *Rossano*, 659 F. Supp. 3d at 570.  Such testing is often necessary because "alternative designs based on engineering principles . . . rely on established principles of physics, material sciences, and industrial design and often utilize technologically sophisticated and carefully calibrated testing methods and devices."  *Id.* at 568 (quotation marks omitted).  That said, the lack of testing does not automatically render an alternative design opinion unreliable.  *See id.* (discussing *Elgert v. Siemens Indus., Inc.*, No. CV 17-1985, 2019 WL 1294819, at *5 (E.D. Pa. Mar. 20, 2019), and emphasizing that the *Elgert* court found the "expert's [alternative design] opinion reliable particularly in light of his 'practical experience'"); *see also Ahner v. Black Bros. Co.*, Civil Action No. 06-1523, 2008 WL 2880382, at *2 (W.D. Pa. May 11, 2008) ("[W]e will not exclude Dr. Knott's proffered expert testimony as inherently unreliable because he did not identify or test actual alternative designs for the machine.").

Although a close call, the Court finds Ms. Cibotti's opinion on alternative designs is sufficiently reliable to go before a jury.  She opines that the Rollator walker's design is defective because it contains a sudden geometric change, which served as a weak point and, in conjunction with the defects in the nylon 6 polymer, caused the wheel fork to break.  In support of that opinion, Ms. Cibotti, based on her significant educational and practical experience, concludes

that this geometric shift is not a necessary design feature (for example, the durable Rollator walker contains a different design), and the manufacturer could have opted for a "smoother geometry" when designing the model of walker used by Bloom.  *See McPeak v. Direct Outdoor Prods., LLC*, Case No. 19-cv-03719-JMY, 2022 WL 4369966, at *5 (E.D. Pa. Sept. 20, 2022) (allowing the plaintiff's expert to testify that a "potential feasible solution" to the design defect "would be to have the cables covered in an anti-corrosive sheathing that permitted periodic inspection," even though the expert did not test whether this alternative design was in fact feasible); *English v. Crown Equip. Corp.*, No. 3:13-0978, 2016 WL 614680, at *10 (M.D. Pa. Feb. 16, 2016) ("Schwartz explained the rationale for his alternative designs using a through bolt and safety wire or a through bolt and cotter pin to fasten the steering wheel. . . .  The court finds that this failure to conduct tests by Schwartz goes to the weight of his opinion and not to its reliability."); *cf. Simmons v. Ford Motor Co.*, 132 F. App'x 950, 953 (3d Cir. 2005) (finding exclusion was appropriate where "proposed alternative was nothing more than a sketch without a mock-up or testing of the design.  Nor could [the expert] affirm that the proposed alternative design *was in use by any vehicle manufacturer* or that any manufacturer had eliminated the possibility of false park in the design of vehicles with automatic transmissions" (emphasis added)); *Rossano*, 659 F. Supp. 3d at 570 (excluding expert opinion about alternative designs where the expert failed to provide "mathematical calculations to support" his alternative designs, "[n]or has he provided any drawings, diagrams, or other models.  Clauser also has not administered tests *or identified similar products to his alternative designs*" (emphasis added)).

Accordingly, the Court finds Ms. Cibotti's failure to test whether the use of a smoother wheel fork design would have prevented the accident goes to the weight of her opinion, and the Court declines to exclude Ms. Cibotti's design defect opinions.

*The Wheel Fork's Manufacture.*  Next, Drive argues that Ms. Cibotti cannot offer an

opinion as to the manufacture of the wheel fork—i.e., that the nylon 6 polymer used for Bloom's

wheel fork malfunctioned because the glass fibers within the material were not uniformly

distributed, resulting in the presence of voids, which weakened the polymer's overall strength

(Cibotti Dep. Tr. at 45:3–7)—because she did not compare the broken wheel fork to an exemplar

wheel fork, to the product's specifications, or to any standard or regulation.  Bloom responds that

Ms. Cibotti did not need to compare the broken wheel fork to an exemplar because a

"manufacturing defect can be established by direct evidence of a breakdown in the machine or a

component," which is exactly what Ms. Cibotti testifies happened here.  (Doc. No. 45-1 at ¶ 12.)

The Court agrees with Bloom.

As discussed below in connection with Drive's motion for summary judgment, direct

evidence that a particular product differed from the manufacturer's specifications is merely one

way that a plaintiff can prove a manufacturing defect.  *See Chandler v. L'Oreal USA, Inc.*, 340 F.

Supp. 3d 551, 565 (W.D. Pa. 2018) ("[T]he absence of direct evidence is not fatal to [the

plaintiff's] claim, as a manufacturing defect can be proven circumstantially under the

malfunction theory.").  Where, as here, a plaintiff lacks direct evidence, they may prove their

case under the malfunction theory by producing circumstantial "evidence of a malfunction along

with evidence ruling out abnormal use or reasonable secondary causes of the malfunction."  *Id.*

So, the fact that Ms. Cibotti's opinion constitutes circumstantial, rather than direct, evidence of a

malfunction does not render her opinion unreliable.

Ms. Cibotti opines that the nylon 6 polymer used for Bloom's wheel fork malfunctioned

because the glass fibers in the material were not uniformly distributed, which contributed to

weakening of the overall matrix.  (*See* Cibotti Dep. Tr. at 45:3–58:22.)  Specifically, the absence

of glass fibers in some areas resulted in the presence of voids, which served as points for possible crack initiation, and more likely than not, resulted in the cracks that, in conjunction with the weakness caused by the sudden geometric change in the wheel fork's design, caused the fork to break.  (*Id.*)  Ms. Cibotti testified that in reaching this conclusion, she followed the scientific method and formulated hypotheses about the wheel fork's manufacture (Cibotti Dep. Tr. at 29:4–30:20), which she then tested using generally accepted methods in the field, including a physical inspection of the broken wheel fork and microscopic testing (Fourier Transform Infrared Spectroscopy (FTIR), scanning electron microscope (SEM), energy dispersive x-ray spectroscopy (EDS), Thermogravimetric Analysis (TGA), and Differential Scanning Calorimetry (DSC)) of the small and large fork fragments (Cibotti Initial Rpt. at 14–20; Cibotti Dep. Tr. at 28:16–29:1, 40:22–42:23).  Given this testimony, the Court finds Ms. Cibotti's opinion about the wheel fork's manufacture rests on good grounds and declines to strike it as unreliable.

 ***Warnings and Instructions.***  Last, Drive challenges Ms. Cibotti's opinions about the walker's warnings and instructions.  Ms. Cibotti opines that the warnings and instructions are inadequate in three ways:  (1) the walker's 300lb weight limit is incorrect and unsupported; (2) the warning does not identify the useful life of the product, which could lead consumers to use it beyond its useful life; and (3) although consumers are warned not to use the walker on "uneven ground," that phrase is ambiguous.  (Cibotti Initial Rpt. at 20–21.)  Drive challenges only the latter two opinions, arguing they are unreliable and should be excluded because Ms. Cibotti did not propose a different warning that should have been used in place of the ones included with the walker, and she conducted no testing or analysis to determine whether a different warning would have prevented Bloom's accident.

The Court will not preclude Ms. Cibotti from opining that the warnings and instructions are deficient to the extent they do not specify the walker's useful life or explain what is meant by the phrase "uneven ground." (*See* Cibotti Dep. Tr. at 90:25–91:24.) As a materials scientist with specialized knowledge of materials failures, including the material used in the walker's wheel fork, Ms. Cibotti was not required to propose or test alternative warnings to be able to opine that the warnings and instructions rendered the design of the walker deficient from an engineering perspective. *See Pineda*, 520 F.3d at 248 ("[T]he District Court focused too narrowly on Clauser's failure either to offer proposed alternative language for a warning or to test the effectiveness of alternative warnings. Pineda proffered Clauser as an engineering expert who understood the stresses and forces that might cause glass to fail. . . . Clauser did not have to develop or test alternative warnings to render an opinion that the 2002 service manual did not provide adequate, step-by-step instructions to account for the different stresses that might be exerted when an automobile technician replaces the rear liftgate brackets and hinges, or that the lack of instructions was a safety issue for the technician."). Accordingly, the Court declines to exclude this portion of Ms. Cibotti's opinion as well.

\*    \*    \*

Because Ms. Cibotti is qualified, and her conclusions are reliable, the Court denies Drive's motion to strike her expert opinions.

### C.    Dr. Odgers's Opinions

Next, Drive moves to exclude in part the opinions of Bloom's physician, Dr. Odgers. (Doc. Nos. 39–40.) Drive argues that Dr. Odgers should be precluded from opining about Bloom's future medical needs and earning capacity because his opinions are speculative. (*Id.* at 6–8.) The Court addresses each argument in turn.

*Future Medical Care*.  First, Drive argues that Dr. Odgers's opinions regarding the need for future medical treatment are unreliable because he has not treated Bloom since December 2022.  (Doc. No. 40 at 5, 7.)  But there is nothing to suggest that this renders unreliable Dr. Odgers's opinions about Bloom's shoulder injury, which are based on numerous physical evaluations, a surgical procedure, and two MRIs, over the better course of a year.  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 758 ("We agree with the defendants that performance of physical examinations, taking of medical histories, and employment of reliable laboratory tests all provide significant evidence of a reliable differential diagnosis.").  Although Dr. Odgers has not seen Bloom in more than two years, there is no evidence that her shoulder injury has changed or improved (or even could improve absent another surgery), such that Dr. Odgers's prior conclusions are no longer accurate.  To the contrary, Dr. Odgers opines that Bloom's shoulder injury is permanent and absent surgery, she will not see any improved function.  (Odgers Rpt. at 5.)

In the alternative, Drive argues that Dr. Odgers's opinions about Bloom's future medical care—and in particular, the need for a reverse total shoulder arthroplasty—are unreliable because they are "based upon speculation and conjecture" to the extent Dr. Odgers opines that "*if* [Bloom's] pain and weakness worsen to the point of her developing pseudoparalysis of her right shoulder, *then* a reverse total shoulder arthroplasty would be necessary to help her restore right shoulder function and relieve pain."  (Doc. No. 40 at 7.)  Drive reasons that because Dr. Odgers has not yet diagnosed Bloom with pseudoparalysis, his opinion that she will require a total shoulder arthroplasty is mere conjecture.  (*Id.*)  But this misconstrues Dr. Odgers's actual opinion surrounding the need for an arthroplasty, which is that, although it will not be "an absolute necessity" unless Bloom develops pseudoparalysis, it remains a viable option to help

with Bloom's "function in her day-to-day life." (Odgers Dep. Tr. at 69:2–20; *see also id.* at 54:1–55:15 (explaining that arthroplasty remains an option if she "want[s] to return to function"); *cf.* Odgers Rpt. at 5 (recommending physical therapy at the September 2022 postoperative visit and noting "possible need for reverse total shoulder arthroplasty" if Bloom's "pain and weakness persisted" without any mention of pseudoparalysis).) And again, this opinion is based on Dr. Odgers's examination and treatment of Bloom's shoulder injury over the course of several months, and Drive has not shown that the methods he used to reach his conclusions are unreliable.

Accordingly, the Court declines to strike Dr. Odgers's opinions about Bloom's future medical needs.

***Earning Capacity***. Next, Drive argues that Dr. Odgers should be foreclosed from opining about Bloom's future earning capacity because he "did not conduct a functional capacity evaluation of Plaintiff, nor did he review any of Plaintiff's prior physical therapy records, workers' compensation records, Social Security records or records from any of Plaintiff's other providers" when formulating this opinion. (Doc. No. 40 at 7.) But again, Drive does not explain why these failures render unreliable Dr. Odgers's conclusions, which are based on his education and experience as an orthopedic surgeon, along with his examination and treatment of Bloom's shoulder. Drive puts forth no evidence to suggest an orthopedic surgeon is unable to reliably opine about a patient's ability to perform the physical demands of a given job or that Dr. Odgers did not rely on techniques generally accepted in the medical community when forming his opinions about Bloom's future earning capacity. *See Stapleton v. Union Pacific Railroad Co.*, Case No. 16-cv-00889, 2020 WL 2796707, at *12 (N.D. Ill. May 29, 2020) (finding that "[a]s a physician and orthopedic surgeon, Dr. Gates is qualified to offer the work restrictions opinion in

his report" and that the physician's opinion was reliable even though it was based purely on a review of the plaintiff's medical records and physical examination and the physician did not perform a functional capacity evaluation or a physical restriction examination).  Accordingly, the Court declines to strike this opinion as well.

*      *      *

The Court denies Drive's partial motion to exclude Dr. Odgers's opinions as unreliable. Drive's concerns are properly addressed through cross-examination, not exclusion.  *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

## IV.    MOTION FOR SUMMARY JUDGMENT

In addition to moving for exclusion of Bloom's experts, Drive also moves for summary judgment on all of Bloom's claims.  (Doc. Nos. 35, 36.)

### A.    Legal Standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.  "[A]t the summary judgment stage the judge's function is not [themselves] to weigh the evidence and determine the truth of the matter

but to determine whether there is a genuine issue for trial." *Id.* at 249.  And at "summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quotation marks and alterations omitted).

Drive argues it is entitled to summary judgment here because Susan Bloom (1) was misusing the walker at the time of the accident, (2) cannot prove the existence of a safer, feasible, alternative design for her design defect claim, (3) has no evidence that the walker contained a manufacturing defect, (4) cannot show that a different warning would have prevented her injuries, and (5) fails to make out a claim for breach of warranties.  To the extent any claim remains alive, Drive argues, in the alternative, that Bloom cannot recover damages for future medical costs or lost earning capacity.  The Court addresses each argument in turn.

### B.      Misuse of the Walker

First, Drive argues that it is entitled to summary judgment on all counts because Bloom was misusing the walker when the accident occurred.  (Doc. No. 35 at 15.)  In Pennsylvania, product misuse is an affirmative defense to a plaintiff's product liability claims.  *Reott v. Asia Trend, Inc.*, 55 A.3d 1088, 1096 (Pa. 2012); *Dillinger v. Caterpillar, Inc.*, 959 F.2d 430, 445 (3d Cir. 1992).  "To establish misuse of the product, the defendant must show that the use was 'unforeseeable or outrageous.'"  *Reott*, 55 A.3d at 1096 (quoting with approval *Gaudio v. Ford Motor Co.*, 976 A.2d 524, 541 (Pa. Super. 2009)); *see also id.* at 1097 ("Both misuse and highly reckless conduct involve a plaintiff's unforeseeable, outrageous, and extraordinary use of a product."); *cf. Cote v. Schnell Indus.*, No. 4:18-CV-01440, 2022 WL 16815032, at *8 (M.D. Pa. Nov. 8, 2022) (explaining that the defendant must show "that the injured party or decedent knew or had reason to know of facts which created a high degree of risk of physical harm to himself or that he deliberately proceeded to act, or failed to act, in conscious disregard of that risk"

(quotation marks omitted)).  In addition, the defendant must prove "that the plaintiff's conduct was the sole or superseding cause of the accident."  *Borden v. Mainline Conveyor Sys., Inc.*, CIVIL ACTION NO. 4:23-CV-01486, 2025 WL 2045736, at *7 (M.D. Pa. July 21, 2025).  That means the defendant "must show that the plaintiff's injury would have occurred regardless of whether alleged defects in the suspect product were cured."  *Id.*; *see also Cote*, 2022 WL 16815032, at *8 ("Consistent with the Pennsylvania Supreme Court's ruling in *Reott* . . . because Schnell cannot show that Cote's conduct was the sole cause of the accident, Schnell cannot advance its reckless conduct and product misuse affirmative defenses.").  Because this is a question of fact, it should not be removed "from the jury unless there is no factual dispute over whether the plaintiff's . . . misuse was the sole or superseding cause of the accident."  *Borden*, 2025 WL 2045736, at *7.

Drive argues that it is entitled to summary judgment on its misuse affirmative defense because "the facts are not subject to reasonable dispute—[Bloom] was using the Rollator as a seat on an uneven and inclined path" despite the warning for "users not to use the Rollator as a seat on inclined or uneven ground."  (Doc. No. 35 at 15–16.)  There are two problems with this argument.  First, there is a dispute of fact as to whether the portion of the garden path where Bloom used the walker was in fact uneven or inclined.  (*See, e.g.*, Bloom Dep. Tr. at 76:9–12 ("I would not have been walking on or sitting on the uneven parts.  I would have moved over to the nice flat parts."); *id.* at 77:16–17 ("I would not sit on a place that was uneven and rocky."); Stutman Dep. Tr. at 28:1–29:4 (testifying that the path was "flat" and although it was not "smooth like concrete or asphalt," it also "wasn't a completely gravel surface.  It was just a little bit around the dirt").)  Second, the warning not to use the walker on "uneven ground" is itself ambiguous, such that the Court cannot find as a matter of law that Bloom's use of the walker on

a natural walkway was so "unforeseeable and outrageous" as to constitute misuse and foreclose her claims. *See Cote*, 2022 WL 16815032, at *7 (explaining that the court previously denied summary judgment because "there are disputed facts relevant to the question of whether Cote's conduct was unforeseeable and outrageous:  The parties disagree on what safety instructions regarding wet sand in the hopper cars Cote . . . received prior to the accident, and what Cote reasonably should have believed regarding the safety of clearing wet sand by hand and the operation of the PTO controls" (cleaned up)).[8]

For those reasons, the Court rejects Drive's contention that it is entitled to summary judgment on its misuse affirmative defense.

### C.    Design Defect

Next, Drive argues that Bloom's design defect claim fails because Bloom has not put forth any evidence of a safer, feasible alternative design that would have prevented the accident. (Doc. No. 35 at 22–23.)  Bloom counters that the existence of a safer, feasible alternative is not a necessary element of a design defect claim in Pennsylvania, and even if it were, Ms. Cibotti opines that a wheel fork with a smoother geometry, like the durable Rollator walker, represents just such an alternative.  (Doc. No. 44-1 at 20–23.)  The Court agrees with Bloom.

Under § 402A of the Second Restatement of Torts, a distributor[9] can be held strictly liable for selling a product "in a defective condition unreasonably dangerous to the user or

---

[8] In the alternative, even assuming Bloom's actions constituted a "misuse" of the walker, there remains a dispute of fact as to whether misuse—as opposed to a product defect—was the sole cause of Bloom's accident.  (*See* Cibotti Supp. Rpt. at 9 (concluding that the "use of the Drive Walker on an unpaved path was not the cause of the failure").)

[9] Under § 402A, Drive is liable for defects in the walker that it distributed, even though it did not manufacture or design the Rollator walker.  (*See, e.g.*, Doc. No. 44-2 at 9 ("Drive did not design or manufacture the Product . . . .")); *see Petka v. Samsung Elecs. Am., Inc.*, 705 F. Supp. 3d 395, 402 (E.D. Pa. 2023) ("'[T]hose who engage in the business of selling a product are subject to both a duty of care in manufacturing and selling the product and a duty to sell a product free from a defective condition," and

consumer." *Id.*; *see also Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 399 (Pa. 2014)

("Pennsylvania remains a Second Restatement jurisdiction . . . .").  To make out such a claim

under a design defect theory in Pennsylvania, the plaintiff must put forth "proof, in the

alternative, either of the ordinary consumer's expectations or the risk-utility of a product."

*Tincher*, 104 A.3d at 399.  Under the consumer expectation standard, a "defective condition" is

defined as a "condition, upon normal use, dangerous beyond the reasonable consumer's

contemplations."  *Id.* at 387.  "The nature of the product, the identity of the user, the product's

intended use and intended user, and any express or implied representations by a manufacturer or

other seller are among considerations relevant to assessing the reasonable consumer's

expectations."  *Id.*  The risk-utility standard, by contrast, considers whether a "'reasonable

person' would conclude that the probability and seriousness of harm caused by the product

outweigh the burden or cost of taking precautions."  *Id.* at 389.  Multiple factors are relevant to

this calculus, including:

> (1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.
>
> (2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.
>
> (3) The availability of a substitute product which would meet the same need and not be as unsafe.
>
> (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
>
> (5) The user's ability to avoid danger by the exercise of care in the use of the product.

---

this duty extends to all entities 'in the chain of distribution to the ultimate consumer.'" (quoting *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 383 (Pa. 2014)).

(6) The user's anticipated awareness of the dangers inherent in the product and their availability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Id.* at 389–90.

Drive does not discuss these tests. Instead, citing *Lance v. Wyeth*, 85 A.3d 434, 443 (Pa. 2014), it argues that Bloom's design defect claim fails because she has failed to prove the existence of a safer, feasible, alternative design. (Doc. No. 35 at 22.) But in *Lance*, the Pennsylvania Supreme Court rejected the suggestion that the existence of an alternative design is a prerequisite to a design defect claim in Pennsylvania. 85 A.3d at 458 n.36 ("We take no issue with the observation that plaintiffs frequently attempt to demonstrate the availability of an alternative safer design to establish a product defect. Neither Wyeth nor its *amicus*, however, have cited any decision of this Court making an alternative safer design an absolute prerequisite to any and all design-based claims.");[10] *Tincher*, 104 A.3d at 401 (rejecting the Third

---

[10] Drive misleadingly cites *Lance* for the following quotation: "It is well-established under Pennsylvania Law that to sustain a claim of design defect, whether sounding in negligence or strict liability, the plaintiff must plead and prove the existence of a safer feasible alternative design." (Doc. No. 35 at 22 (quoting *Lance*, 85 A.3d at 443).) But counsel failed to indicate that this language was itself a quotation in a parenthetical citing an amicus brief submitted to the *Lance* court:

> According to Wyeth and its amicus, this understanding has led Pennsylvania courts to require evidence of an alternative safer design to support a design-defect claim outside the pharmaceuticals arena. See Brief for Wyeth at 31 & n. 6 (citing *Duchess v. Langston Corp.*, 564 Pa. 529, 559 n. 24, 769 A.2d 1131, 1149 n. 24 (2001)); Brief for Amicus Prod. Liab. Advisory Council, Inc. at 22 **("It is well-established under Pennsylvania Law that to sustain a claim of design defect, whether sounding in negligence or strict liability, the plaintiff must plead and prove the existence of a safer 'feasible alternative design.'")** (citing, inter alia, *Berrier v. Simplicity Mfg., Inc.*, 598 Pa. 594, 597 n.1, 959 A.2d 900, 902 n.1 (2008) (Saylor, J., concurring)).

*Lance*, 85 A.3d at 247 (emphasis added). As the quoted language shows, no attorney could reasonably interpret the emphasized portion as being a holding of the *Lance* court. And to the extent Drive's counsel

Restatement of Tort's description of design defect claims in part because the Third Restatement articulates the "burden of proof in terms of evidence (alternative design)," which "proscriptively limits the applicability of the cause of action to certain products as to which that sort of evidence is available," and concluding, instead, that proof of a feasible alternative design is relevant to, not necessary for, plaintiff to prove a design defect claim under the consumer protection and risk-utility standards).  In the years since the Pennsylvania Supreme Court's opinions in *Lance* and *Tincher*, courts in this District have confirmed that proof of an alternative design is not a prerequisite to stating a design defect claim in Pennsylvania.  *See Macaluso v. Apple Inc.*, CIVIL ACTION NO. 21-1361, 2023 WL 4685965, at *15 (E.D. Pa. July 21, 2023) ("Apple cites to no post-*Tincher* case that persuades this Court that evidence of a reasonable alternative design is, strictly speaking, a prerequisite to Mr. Macaluso's design defect claim."); *McPeak*, 2022 WL 4369966, at *5 ("While the risk-utility test is similar and evidence of an alternative design is relevant, the risk-utility test does not require that Plaintiffs' expert engineer the product for Defendants.  The consumer expectation test also does not require proof of an alternative design. In sum, while some jurisdictions may require evidence as to an alternative design, there is no binding precedent in Pennsylvania that mandates alternative design testing in Pennsylvania design defect cases.").

---

was nevertheless in doubt, the sentence quoted above ends with a footnote, in which the *Lance* court states: "As further discussed below, the decisions on which Wyeth and the Council rely do not actually reflect a holding of this Court that evidence of an alternative safer design is an unyielding requirement in design-defect litigation in Pennsylvania."  *Id.* at 247 n.12.

       This is just one instance (albeit the most egregious) of Drive's counsel misconstruing the case law.  Accordingly, the Court takes this moment to remind counsel that such conduct is contrary to the duties of professionalism and candor expected of attorneys practicing before the Eastern District of Pennsylvania.

Drive does not discuss these cases, and instead, relies on *Dunlap v. Federal Singal Corp.*, 194 A.3d 1067 (Pa. Super Ct. 2018). In *Dunlap*, the plaintiff firefighters claimed that they suffered permanent hearing loss from their firetruck's siren, which was manufactured by the defendant. *Id.* at 1068. In support of their product liability claims, the firefighters hired an acoustics expert, who opined that the manufacturer could have used a shroud on the siren to "funnel the noise in a cone-shaped direction in front of the firetruck, thereby reducing the noise level in the cab of that vehicle." *Id.* The manufacturer responded that attaching a shroud "would render its product less safe for the pedestrians and motorists it was intended to warn," and it argued that the court should grant summary judgment in its favor because the firefighters had failed to "offer *prima facie* evidence that the shrouded alternative was effective and safe for all users." *Id.* The trial court agreed, and on appeal, the Pennsylvania Superior Court affirmed. *Id.* at 1073.

Recognizing that sirens are inherently dangerous, the parties and the courts in *Dunlap* analyzed the firefighters' design defect claims only under the risk-utility standard and without considering the alternative, consumer expectation standard. *Dunlap*, 194 A.3d at 1070–71; *cf. Tincher*, 104 A.3d at 389 (describing the risk-utility standard as a test which, unlike the consumer expectation test, accounts for the "difficulty related to vindicating the salient public policy in cases in which the alleged defective condition is premised upon either an obvious danger or a danger outside the ordinary consumer's contemplation"). The *Dunlap* courts found that under the risk-utility analysis, the firefighters were required to put forth some evidence that the shrouded siren was effective as a warning device for pedestrians and motorists. *Id.* at 1073; *see also Dunlap v. Am. Lafrance, LLC*, No. GD-13-006083, 2016 WL 9340617, at *2 (Pa. Ct. Comm. Pl. Apr. 14, 2016) ("In this case, . . . the Federal Signal sirens, as a matter of law, do not

cause danger that is unreasonable because the benefits from the use of the sirens to firefighters and other members of the public outweigh the harm which the use causes.  Thus, in order for plaintiffs to prevail, it is plaintiff's burden to describe an alternative design that will reduce the noise to which firefighters will be exposed without introducing new and greater hazards.").  Because that issue involved "technical matters that are beyond the ken of ordinary persons and within the knowledge of expert witnesses available to the parties," the courts reasoned that evidence of effectiveness was required to come from an expert.  *Dunlap*, 194 A.3d at 1073.[11]  Although the firefighters had offered evidence "that their proposed alternative design was safer for firefighters," they had "failed to adduce [a] competent expert opinion that [the shrouded siren] also met the need for an effective warning for motorists and pedestrians."  *Dunlap*, 2016 WL 9340617, at *3.

Drive reasons that *Dunlap* necessitates summary judgment in this case because Ms. Cibotti "not only . . . fail[s] to identify any proposed alternative design" for the walker's wheel fork, she also does not "opine regarding the effectiveness" of an alternative design.  (Doc. No. 35 at 23.)  But Drive overstates *Dunlap*'s holding and its applicability in this case.  As noted above, the parties and the courts in *Dunlap* analyzed the plaintiffs' design defect claims only under the risk-utility test and without considering the alternative, consumer expectation test.  *Dunlap*, 194 A.3d at 1070–71.  Here, by contrast, Bloom proceeds under both theories (*see* Doc. No. 41-1 at 22), either of which can support a claim for design defect, *see Tincher*, 104 A.3d at 401.  Drive does not argue that Bloom has failed to state a claim under the consumer protection standard, nor

---

[11] By contrast, the trial court found that expert testimony was not necessary to show that the shrouded siren would be a safer alternative for the firefighters inside the truck.  *See Dunlap*, 2016 WL 9340617, at *3 ("Contrary to Federal Signal's assertion, expert testimony may not be required for a jury to be permitted to find that hearing loss will be reduced if sirens are equipped with a shroud that directs noise generated by the siren to the 100-degree arc previously described.  Arguably, it stands to reason that hearing loss is likely to decline if firefighters can avoid exposure to high levels of noise.").

has it meaningfully discussed Bloom's argument under that theory that "the danger that the geometry of the wheel fork rendered it susceptible to fatigue and failure was certainly unknowable and unacceptable to consumers, including Ms. Bloom." (Doc. No. 41-1 at 22.) That alone is reason to deny Drive's motion for summary judgment on Bloom's design defect claims.

But, even if the Court were to view Drive's motion as seeking partial summary judgment to the extent Bloom relies on the risk-utility theory, Drive's reliance on *Dunlap* would still fail. For one, and contrary to Drive's characterization, *Dunlap* does not hold that expert testimony as to the existence and effectiveness of an alternative design is a prerequisite to stating a design defect claim under the risk-utility standard.[12] Instead, the court found expert testimony necessary in that case because the issue of whether the hooded siren would sufficiently alert pedestrians and motorists involved "technical matters that are beyond the ken of ordinary persons and within the knowledge of expert witnesses available to the parties." *Dunlap*, 194 A.3d at 1073; *cf. Dunlap*, 2016 WL 9340617, at *3.

Second, even if the Court found that this case, like the case in *Dunlap*, required expert testimony as to a safer, feasible alternative design, Ms. Cibotti has provided that evidence. As the Court previously explained, Ms. Cibotti has identified a defect in the design of the walker's wheel fork: it contained a geometry change in the nature of a semi-circular stress concentration that reduced the fatigue life of the product. (Doc. No. 45-1 at 10; *see also* Cibotti Dep. Tr. at 83:7–11.) She opines that a "smoother geometry would reduce the concentration of stress at this

---

[12] Even if *Dunlap* had held as much—and again, it did not—this Court would not be bound to follow the holding of an intermediate state court that is directly at odds with the holding of the relevant state supreme court. *Cf. Robinson v. Jiffy Exec. Limousine Co.*, 4 F.3d 237, 242 (3d Cir. 1993) (explaining that "[d]ecisions of state intermediate appellate courts which have not been reviewed by the highest court of the state" are "evidence of state law" but "not dispositive").

part of the fork component."  (Cibotti Initial Rpt. at 24 (emphasis added).)  And she identifies

Drive's durable Rollator walker as containing a feasible alternative, in that its wheel fork has a

different design that lacks the sudden geometry change of Bloom's walker.  (Cibotti Dep. Tr. at

84:4–15.)[13]  Although Ms. Cibotti did not examine the durable Rollator walker or conduct testing

to see if the accident would have nevertheless occurred if Bloom was using that type of walker,

these weaknesses are relevant, not decisive, under the risk-utility factor test.[14]

 For those reasons, Drive's motion for summary judgment on Bloom's design defect claim

is denied.

### D. Manufacturing Defect

 Third, Drive argues that Bloom's manufacturing defect claim fails because she has not

shown that the broken wheel fork on her walker deviated from the manufacturer's design

specifications or that it was otherwise defectively manufactured.  (Doc. No. 35 at 16–17.)  The

Court disagrees.

 As noted in connection with Drive's motion to exclude Ms. Cibotti's opinions, direct

evidence that a particular product differed from the manufacturer's specifications is merely one

way that a plaintiff can prove a manufacturing defect.  *See Chandler*, 340 F. Supp. 3d at 565

("[T]he absence of direct evidence is not fatal to [the plaintiff's] claim, as a manufacturing defect

can be proven circumstantially under the malfunction theory.").  When a plaintiff lacks direct

evidence, they may prove their case under the malfunction theory by producing circumstantial

---

[13] Drive makes the bizarre argument that Ms. Cibotti "does not identify any specific defect in the design of the wheel fork of the Rollator" and "fail[ed] to identify any proposed alternative design for the Rollator."  (Doc. No. 35 at 23.)  Given the parties' discussion throughout the record of the wheel fork's geometric shift, the need for a smoother geometry, and the existence of the durable Rollator walker, this argument obviously fails.

[14] Drive does not discuss the risk-utility factors or argue that those factors show, as a matter of law, that it is entitled to judgment in its favor, so the Court does not analyze them here.

"evidence of a malfunction along with evidence ruling out abnormal use or reasonable secondary causes of the malfunction." *Id.* Here, Bloom has put forth evidence as to both elements.

As to malfunction, Ms. Cibotti opines that the glass fibers in the nylon 6 polymer used for Bloom's wheel fork were not uniformly distributed, which contributed to weakening of the overall matrix. (*See* Cibotti Dep. Tr. at 45:3–58:22.) Specifically, the absence of glass fibers in some areas resulted in the presence of voids, which served as points for possible crack initiation, and more likely than not, resulted in the cracks that, in conjunction with the weakness resulting from the geometric change in the wheel fork's design, caused the fork to break. (*Id.*) As for an alternative cause, Bloom has put forth evidence to refute Drive's contentions that a secondary cause (misuse of the walker) caused the wheel fork to break, and at this stage, the Court is required to view these disputes of fact in Bloom's favor. (*See, e.g.*, Bloom Dep. Tr. at 76:9–12, 77:16–17; Stutman Dep. Tr. at 28:1–29:4; Cibotti Supp. Rpt. at 9.)

Drive argues that the Court should preclude Bloom from pursuing her manufacturing defect claim under the malfunction theory because she could have—but did not—put forth direct evidence that the nylon 6 polymer used for the broken wheel fork differed from the manufacturer's specifications. (Doc. No. 35 at 17.) Drive cites no cases that suggest such a sanction is appropriate in this (or any other) case. Regardless, Drive's argument also misconstrues the efforts that Bloom and Ms. Cibotti took to proceed under a direct evidence theory. As Ms. Cibotti explains in her deposition, she "requested an exemplar [wheel fork] for the initial inspection and was told there was a change in suppliers," so "the defense could not provide [her] with" one. (Cibotti Dep. Tr. at 45:24–46:6; *see also* Doc. No. 53 (defense counsel confirming that Drive does not have access to the technical data sheet for the walker).) And she

did not "make any effort to obtain one on [her] own" because "if there was a change in suppliers, then it would be apples to oranges." (*Id.* at 46:8–10.)[15]

Drive ignores this fact in its briefing, arguing instead that Ms. Cibotti could have compared the broken wheel fork to one of the unbroken wheel forks on the walker's three intact wheels. (Doc. No. 35 at 17.) But Ms. Cibotti explained during her deposition that this did not seem necessary at the time because "the parties had already agreed on an inspection protocol" and even if she had analyzed one of the unbroken caster wheels, it is possible that it "could have experienced degradation" to the same extent as Bloom's broken wheel. (Cibotti Dep. Tr. at 47:1–48:2.) Considering the entirety of the circumstances and Drive's failure to provide any case law on this front, the Court will not foreclose Bloom from pursuing her manufacturing defect claim under the malfunction theory.

Accordingly, the motion for summary judgment is denied as to Bloom's manufacturing defect claim.

### E.    Failure to Warn

Fourth, Drive moves for summary judgment on Bloom's failure-to-warn claim. (Doc. No. 35 at 18–21.) In addition to manufacturing and design defects, a product may be defective because it was distributed with inadequate warnings. *See Phillips v. A-Best Prods. Co.*, 665 A.2d 1167, 1170 (Pa. 1995) ("There are three different types of defective conditions that can give rise to a strict liability claim: design defect, manufacturing defect, and failure-to-warn defect."). "A product is defective due to a failure-to-warn where the product was 'distributed without sufficient warnings to notify the ultimate user of the dangers inherent in the product.'" *Id.* at

---

[15] During a telephone status conference on September 29, 2025, defense counsel also represented that Bloom likely could not have subpoenaed an exemplar from the manufacturer in any event because the manufacturer is in China and beyond the Court's jurisdiction.

1171; *see also Pavlik v. Lane Ltd./Tobacco Exporters Intern.*, 135 F.3d 876, 881 (3d Cir. 1998) ("Under [the Second Restatement of Torts] § 402A, an otherwise properly designed product may still be unreasonably dangers (and therefore 'defective') for strict liability purposes if the product is distributed without sufficient warnings to apprise the ultimate user of the latent dangers in the product.").

"As with the other types of strict liability claims, a plaintiff raising a failure-to-warn claim must establish only two things: that the product was sold in a defective condition 'unreasonably dangerous' to the user, and that the defect caused plaintiff's injury." *Phillips*, 665 A.2d at 1171 (footnote omitted). Under the first element, "the plaintiff must show that a warning of a particular danger was either inadequate or altogether lacking, and that this deficiency in warning made the product 'unreasonably dangerous.'" *Id.* "[F]or a warning to be adequate as a matter of law under Pennsylvania law, it must: (1) accurately and unambiguously convey the scope and nature of the risk, and (2) state the risk with sufficient specificity." *Power*, 2024 WL 4040432, at *6 (quoting *Schrecengost v. Coloplast Corp.*, 425 F. Supp. 3d 448, 462 (W.D. Pa. 2019)). "A warning of a particular risk is not adequate as a matter of law, even when that warning is accurate, if there are disputes over whether the warning was sufficiently explicit and detailed." *Id.* (quoting *Schrecengost*, 425 F. Supp. 3d at 462).

Under the second element, the plaintiff establishes causation by demonstrating that "the user of the product would have avoided the risk had he or she been warned of it by the seller." *Phillips*, 665 A.2d at 1171 "To reach a jury on a failure to warn theory of liability, the evidence must be such as to support a reasonable inference, rather than a guess, that the existence of an adequate warning might have prevented the injury." *Pavlik*, 135 F.3d at 881. "[T]he plaintiff enjoys the benefit of a rebuttable presumption that an adequate warning would have been heeded

if it had been provided." *Id.*; *see also id.* at 883 (predicting that Pennsylvania would adopt a

rebuttable heeding presumption).[16]  Drive argues that Bloom has failed to put forth evidence to

supports either element.

First, Drive argues that Bloom has not shown through expert testimony[17] that the

walker's warnings and instructions were inadequate.  But, as the Court discussed above in

connection with Drive's motion to exclude Ms. Cibotti's opinions, Ms. Cibotti opines that the

warnings and instructions are inadequate in three ways:  (1) they give a 300lb weight limit for

the walker, but that limit is unsupported and inaccurate, considering the several prior failures of

the walker and the lack of weight limit testing produced in this case; (2) they do not identify the

---

[16] Most cases proceed under this presumption, and the Court does the same here; however, we note that it is "undisputed that Ms. Bloom read the manual and the associated warning[s]" that came with the walker.  (Doc. No. 49 at 7.)

[17] Despite Drive's confident assertion to the contrary, it is not clear that expert testimony is required to prove a failure-to-warn claim in Pennsylvania.  Although Drive cites multiple cases for that proposition, only two unpublished district court opinions stand for it, and in those two cases, the issue was undisputed because the parties agreed that expert testimony was necessary.  *See Webb v. Tahsin Indus. Corp.*, 4:14-CV-01499, 2016 WL 454821, at *2 & n.10 (M.D. Pa. Feb. 5, 2016); *English*, 2016 WL 614680, at *10.  The remaining cases cited by Drive either involved a different state's laws, were context-specific, or suggest that expert testimony is *not* necessary.  *See LaBarre v. Bristol-Myers Squibb Co.*, 544 F. App'x 120, 125 (3d Cir. 2013) (explaining that expert testimony is required under *Florida* law); *Soufflas v. Zimmer, Inc.*, 474 F. Supp. 2d 737, 751 (E.D. Pa. 2007) (finding expert testimony is required for negligent failure-to-warn claim where the allegedly defective product is a prescription medical device); *Lynn ex rel. Lynn v. Yamaha Golf-Car Co.*, 89 F. Supp. 2d 606, 639–40 (W.D. Pa. 2012) (explaining that a failure-to-warn plaintiff must show "through experts *or otherwise* why the warnings are allegedly inadequate or how the existing warnings could be improved" (quoting *Hoffman v. Paper Converting Machine Co.*, 694 F. Supp. 2d 359, 367 (E.D. Pa. 2010)) (emphasis added).

Consistent with *Lynn ex rel. Lynn*, in cases where the issue was disputed, federal and state courts interpreting Pennsylvania law have found that expert testimony is *not* required as a matter of law to state a claim for failure to warn.  *See Whyte v. Stanley Black & Decker, Inc.*, 514 F. Supp. 3d 684, 699 (W.D. Pa. 2021) ("While expert testimony is generally required for complex issues, a jury is capable—without expert testimony—of deciding whether a simple warning label, like the one here, is inadequate so as to render the product unreasonably dangerous."); *Power v. Hewlett-Packard Co.*, 2024 WL 4040432, at *6 (W.D. Pa. July 19, 2024) ("HP's claim that Power's case must fail as a matter of law because expert testimony is required in all failure to warn cases is also legally inaccurate."); *Dion v. Graduate Hosp. of Univ. of Pa.*, 520 A.2d 876, 881 (Pa. Super. Ct. 1987) ("Where any layperson can understand the insufficiency of a warning, expert testimony is not necessary.").

useful life of the walker, which could lead consumers to use it beyond its useful life; and (3) although they warn consumers not to use the walker on "uneven ground," the term "uneven" is ambiguous, and therefore, the warning itself is inadequate. (Cibotti Initial Rpt. at 20–21.) Given this testimony, the Court cannot find as a matter of law that the warnings and instructions were adequate. *See Power*, 2024 WL 4040432, at *6 ("There are simply too many genuine issues of fact, especially with respect to whether the warning was sufficiently specific with respect to the risk of fire or explosion, and the scope and nature of the risk and its consequences, for the Court to determine that the warning HP provided was adequate as a matter of law."); *Bunting v. Ryder Truck Rental, Inc.*, NO. 96–3683, 1999 WL 126920, at *3 (E.D. Pa. Mar. 9, 1999) (finding genuine issues of material fact as to the warning's adequacy precluded summary judgment on the plaintiff's failure to warn claim).

Second, Drive argues that Bloom has failed to show a revised warning would have prevented the accident. (Doc. No. 35 at 19–21.) As a reminder, Bloom is entitled to a rebuttable presumption that she would have heeded a revised warning had one been given. *Pavlik*, 135 F.3d at 881. Drive argues that the presumption is rebutted here because the undisputed evidence shows that Bloom "knew not to use the walker as a seat on uneven or sloped terrain and yet failed to obey that warning, suggesting any additional warnings would have gone unheeded." (Doc. No. 35 at 19–20.) But this argument ignores that there is a dispute of fact as to the makeup of the garden path where the accident occurred. When the evidence is viewed in the light most favorable to Bloom, a jury could find that the path was not in fact "uneven or sloped," and therefore, Bloom did not disregard the warning on this point. Likewise, the jury could find that even if the path was "uneven," that term is ambiguous as used in the walker's warning, such that Bloom's use of the walker as a seat did not constitute a knowing disregard of the warning.

41

In the alternative, Drive argues that the heeding presumption is rebutted because Bloom is experienced in working with Rollator walkers and previously taught her own patients how to use them, suggesting that no additional warning would have changed her behavior. This argument is difficult to follow. It is unclear how Bloom's thorough knowledge surrounding the walker renders her *less* likely to heed the manufacturer's warnings. Indeed, the fact that Bloom taught her own patients how to properly use the walker suggests she is *more* likely than the average user to read and heed the warnings and instructions included with it—a fact Bloom's testimony bears out. (*See* Bloom Dep. Tr. at 76:9–22 (testifying that she "would not have been walking on or sitting on the uneven parts" of the path, but instead, would follow the flattest portion of the path and pause on level ground); *id.* at 77:12–17 ("[W]hen I walked with my walker, I take the path of least resistance. I will not go in a straight line just because it's a straight line. I will go where it's the most level and most even, and I would not sit on a place that was uneven and rocky.").)

Because there are disputes of fact as to whether the walker's warnings and instructions were adequate and whether a revised warning would have prevented the accident, Drive's motion for summary judgment on Bloom's failure-to-warn claim is denied.

### F.    Breach of Warranties

Fifth, Drive argues that it is entitled to summary judgment on Bloom's claim for breach of warranties because the claim "rise[s] and fall[s] on the same underlying theory as her product liability claims." (Doc. No. 35 at 24.) In other words, "[b]ecause Plaintiff cannot demonstrate that the Rollator is defective, she cannot prevail on her warranty claims." (*Id.*) This argument fails. Because the Court finds disputes of fact foreclose summary judgment on Bloom's design defect, manufacturing defect, and failure-to-warn claims, we also decline to grant summary judgment in Drive's favor on Bloom's breach of warranties claim.

### G.    Limitations on Recovery

That leaves Drive's argument that to the extent any claim survives, the Court should limit Bloom's ability to recover for future medical costs and lost earnings.  The Court addresses each issue in turn.

### 1.    <u>Future Medical Costs</u>

First, Drive moves for summary judgment as to Bloom's request for future medical costs. (Doc. No. 35 at 30–31.)  It argues that Bloom has failed to put forth admissible evidence that Bloom will definitively require future medical care.  (*Id.*)  Bloom disputes this characterization of the record, arguing that Dr. Odgers opines that Bloom's shoulder injury is permanent and that a reverse total shoulder arthroplasty is the only meaningful treatment option for her to restore function and relieve pain, regardless of whether she ultimately develops pseudoparalysis.  (Doc. No. 44-1 at 24–25.)  Once again, the Court finds that Bloom has the better argument.

"Under Pennsylvania law, 'it is well-settled that a plaintiff in a personal injury action may introduce expert testimony to support a claim that he may suffer certain future harm as a result of a past injury.'"  *Repa v. Napierkowski*, 1:19-cv-00101-RAL, 2022 WL 1322529, at *2 (W.D. Pa. May 3, 2022) (quoting *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1093–94 (Pa. 1985), *abrogated on other grounds by Kirkbride v. Lisbon Contractors, Inc.*, 555 A.2d 800 (Pa. 1989)).  A physician opining on prognosis is not "required to express his opinion with the definiteness required in a causation question," *id.* (quoting *Martin*, 494 A.2d at 1094) or to "predict the exact result anticipated," *id.* (quoting *Fretts v. Pavetti*, 422 A.2d 881, 885 (Pa. 1980).  That said, the expert's testimony cannot rest on "speculation," "conjecture," or "a mere possibility or fear of future consequences."  *Id.* at *2, *4 (quoting *Fretts*, 422 A.2d at 885).

Drive argues that Dr. Odgers's testimony does not support Bloom's request for future medical costs because he merely speculates that Bloom will require a reverse total shoulder

arthroplasty. For this contention, Drive focuses on Dr. Odgers's opinion that "*if [Bloom's] pain and weakness worsen* to the point of her developing pseudoparalysis of her right shoulder, then a total reverse arthroplasty would be necessary to help her restore right shoulder function and relieve pain." (Doc. No. 35 at 30 (quoting Odgers's Rpt. at 5).) If that were Dr. Odgers's only discussion of the issue, then the Court would be inclined to agree with Drive that Dr. Odgers failed to "clarify with reasonable certainty the likelihood of Plaintiff's pain worsening or the need for surgery." (*Id.*) But in his deposition, Dr. Odgers explained that even if Bloom "does not develop pseudoparalysis of her right shoulder" the reverse total shoulder arthroplasty "absolutely" remains "a treatment option for her" because it will restore function and limit pain caused by the permanent tear in her rotator cuff. (Odgers's Dep. Tr. at 72:7–14; *see also*, *id.* at 54:1–55:15 (explaining that arthroplasty remains an option if she "want[s] to return to function"); Odgers's Rpt. at 5 (opining that Bloom's shoulder cannot be re-repaired and absent a reverse total arthroplasty, Bloom will not see any improvement in function).) Consistent with this opinion, the record shows that to date, Bloom has been unable to successfully restore function in her shoulder, that she continues to experience pain, and that she intends to move forward with surgery in the next couple of years regardless of whether she develops pseudoparalysis. (Bloom Dep. Tr. at 119:7–122:13.)

A jury, viewing this evidence in the light most favorable to Bloom could find that a reverse total shoulder arthroplasty is a reasonably foreseeable future medical procedure arising out of Bloom's shoulder injury and award damages for the cost of that expense.[18] *See Rogers v.*

---

[18] Drive also argues that Bloom has failed to put forth sufficient evidence to show the likely cost of this procedure and other future medical expenses. (Doc. No. 35 at 31.) Specifically, it argues that "Plaintiff's claim for future medical costs is not saved by her offering a Cost Projection report" because that report "explicitly indicates it is based solely on a review of the Narrative Report of Charles J. Odgers IV., MD." (*Id.*) Because the Court declines to exclude Dr. Odgers's expert opinion and finds that

*Blair*, CIVIL ACTION NO. 24-1534, 2025 WL 2109350, at *6 (E.D. Pa. July 28, 2025)

(denying motion to exclude where the expert physician opined that "surgery—the single largest

projected cost—would only be necessary if conservative treatments," which the plaintiff had yet

to pursue, "fail," because the physician's "report explains why he believes surgery is 'reasonably

probable,'" and at trial, "the parties can question [the physician] concerning the basis for this

conclusion and how he currently quantifies the risk of future surgery"); *see also Gradel v.

Inouye*, 421 A.2d 674, 680 (Pa. 1980) (finding the jury could properly consider the physician's

testimony about the possibility that the plaintiff would develop cancer in the future because a

"doctor properly may be allowed to explain the possible future effects of an injury, and with less

definiteness than is required of opinion testimony on causation"); *Schwegel v. Goldberg*, 228

A.2d 405, 408 (Pa. Super. Ct. 1967) ("[I]n this case, a scar on the brain, an abnormal condition,

resulted from the accident.  There was no speculation or guessing as to that medical fact.  Nor

was the neurosurgeon speculating or guessing when, based on statistics in his field of expertise,

he indicated the probabilities of this particular plaintiff suffering from epileptic seizures as a

result of a condition caused by this accident.").

     Accordingly, the Court declines to grant summary judgment in Drive's favor on Bloom's

request for future medical costs.

     **2.**    <u>**Lost Earnings**</u>

     Last, Drive argues that Bloom is judicially estopped from pursuing damages for lost

earnings and lost earning capacity because during her workers' compensation proceeding in

2023, she claimed she was completely disabled and unable to work because of her ankle injuries,

---

his opinion shows Bloom will need future medical care, the Court also rejects Drive's arguments as to
Bloom's cost projections.

and she ultimately settled that claim in an agreement that covered future wage loss. (Doc. No. 35 at 24–28.) In the alternative, Drive argues that Bloom has failed to produce any evidence from which a jury could conclude that her shoulder injury prevents her from working as an occupational therapist. (*Id.* at 28.) The Court addresses each issue in turn.

**Judicial Estoppel.** Judicial estoppel is an equitable doctrine that "bars a litigant from asserting a position that is inconsistent with one he or she previously took before a court or agency." *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779 (3d Cir. 2001). When a defendant moves at summary judgment for application of judicial estoppel, courts apply the method outlined by the United States Supreme Court in *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999). *See Detz v. Greiner Indus., Inc.*, 346 F.3d 109, 115–18 (3d Cir. 2003) (recognizing "*Cleveland*—rather than our traditional three-step 'judicial estoppel' approach—as the guiding force in the context of a summary judgment motion where, as here, the claimant clearly made a contradictory assertion after benefitting from a previous sworn assertion, the court or agency thus having accepted the previous assertion"). Under this standard, the court first asks "whether the position[ ] taken by" the plaintiff in the prior proceeding "genuinely conflict[s]" with the position taken by the plaintiff in the current proceeding. *Id.* at 118. If the two are inconsistent, then the court asks whether the plaintiff "has adequately reconciled the two positions." *Id.* at 120.

Drive argues that judicial estoppel is appropriate here because Bloom has taken "irreconcilable positions as to her ability to work in petitions before the Workers' Compensation Division and in this litigation" in that here, she "seeks damages for loss of earnings . . . due to the shoulder injury," while in 2023, she indicated to the workers' compensation judge that she was "unable to work" because of her ankle injuries. (Doc. No. 35 at 27.) Bloom argues that the two

positions are not inconsistent because her statements before the workers' compensation judge were sufficiently limited in time.  (*See* Doc. No. 44-1 at 23–24.)  The Court agrees with Bloom.

To determine whether Bloom's statements to the workers' compensation judge conflict with her current request for lost earnings, the Court must consider the statements in context and with due consideration to the "unique facts" of the case.  *Detz*, 346 F.3d at 119.  In January 2023, before the workers' compensation judge, Bloom claimed that she was incapable of returning to her position as an occupational therapist because she had not recovered from ankle injuries; she did not claim that her ankle injuries were permanent or that they would prevent her from ever again being able to work as an occupational therapist.  (*See* Doc. No. 36-5 at 2 ("I am now under the care of Dr. Anaim.  I underwent recent injections and he advised that I might require surgery for my left ankle.  He had advised that I am unable to perform any kind of work *at this time* unless it is a desk job." (emphasis added)); *id.* at 2–3 (stating she "only wish[es it] were the case" that she was "*fully* recovered and that there [wa]s no need for further treatment regarding [her] ankles"); *see also id.* at 7 (Dr. Anaim's verification of disability dated January 19, 2023); Bloom Dep. Tr. at 19:13–19 (testifying that "*[a]t the point*" the carrier moved to terminate wage benefits in January 2023, Bloom "did not feel that [she] was recovered enough to safely protect [her] clients and [her]self" given the ongoing pain and instability in her left ankle (emphasis added)).)  More than a year and a half later, Bloom testified in this case that her ankle injury ultimately improved, such that she would have been capable of working as an occupational therapist if it were not for her shoulder injury.  (Bloom Dep. Tr. at 22:19–21 ("Q. [ ] Are you still experiencing pain or disability with your left ankle?  A. Not really."); *id.* at 23:3–24:2 ("Q. [ ] So after January of '23, at any time, did [your ankles] recover to the point where [the injuries] would not have prevented you from having an occupational therapy job?  A. I think so."); *id.* at

125:2–6 (testifying that in 2024 she chose not to renew her occupational therapy license "not because of the ankles anymore, but because of the shoulder").)

Viewing Bloom's assertions in context, the Court does not find a "genuine conflict" between her assertions before the workers' compensation judge and her request for lost earnings here.  It is certainly plausible that:  (1) in January 2023, Bloom was incapable of working as an occupational therapist because of the ongoing pain and instability in her left ankle; and (2) this injury had sufficiently resolved by October 2024 such that she could have gained employment as an occupational therapist; but (3) at that point, she was unable to do so because of her shoulder injury.  *See Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 608 (3d Cir. 2006) (finding "no inconsistency" between the statements that the plaintiff made in support of her application for Social Security Disability Insurance and her ADA claim because in her prior application, the plaintiff "did not state categorically that [she] could not work at all" or that she was unable to work even with a reasonable accommodation); *Ocasio v. Ollson*, 596 F. Supp. 2d 890, 904 (E.D. Pa. 2009) ("It is clear that, taking all language contained in the C & R as a whole, and considering this language in its proper factual context, Plaintiff merely released his employer from further liability regardless of the description of his injuries.  To later file a damages claim for all of the injuries that he allegedly sustained against Defendants is not an example of a litigant playing 'fast and loose' with the judicial system, and judicial estoppel is not appropriate."); *cf. Motley v. N.J. State Police*, 196 F.3d 160, 167 (3d Cir. 1999) ("Motley, relying on several specific and severe physical injuries, asserted that he was 'permanently and totally disabled.'  This was not a mere blanket statement of complete disability checked on a box in order to obtain pension benefits.  Rather, the assertion was supported by Motley's additional statements concerning the type and extent of his injuries.  Furthermore, the medical board

diagnosis, uncontested by Motley, also concluded that Motley was permanently incapacitated for police officer duties.  On their face, these assertions are patently inconsistent with his present claims that he was a 'qualified individual' under the ADA.").

Because Bloom's statements in the workers' compensation proceeding are not in genuine conflict with her request in this case for lost earnings caused by her shoulder injury, judicial estoppel is not appropriate.[19]

**Evidence of Lost Earnings.**  In the alternative, Drive argues that it is entitled to summary judgment on Bloom's request for lost earnings because she failed to "produce any evidence that would permit a jury to conclude that she lost earnings or earning capacity as a direct result of her alleged shoulder injury."  (Doc. No. 35 at 28.)  According to Drive, the undisputed evidence shows that Bloom "had no earning capacity" when the accident occurred because "(1) she was not engaged in any form of employment at the time she fell from her Drive Rollator; and (2) her prior testimony and the related documentation submitted in connection with her workers' compensation claim make it clear her ankle injury, not her shoulder injury, prohibited her from working as an occupational therapist."  (Doc. No. 35 at 28–29.)  Drive's argument once again ignores that contrary evidence also exists in the record, including Bloom's testimony that her ankle pain and instability were sufficiently resolved by no later than October 2024, and Dr. Odgers's expert opinion that because of Bloom's shoulder injury, "she will not be able to

---

[19] In the alternative, Drive argues that Bloom should be estopped from arguing that her shoulder injury has resulted in lost earnings because her workers' compensation settlement agreement included a settlement for future wage loss, and after the settlement was finalized, Bloom began receiving social security retirement income.  (Doc. No. 35 at 28.)  Drive provides no analysis or case law in support of these positions.  Indeed, Drive has not identified any specific statements made by Bloom in either forum, which it believes are irreconcilable with Bloom's request for lost earnings here.  Accordingly, the Court does not address these arguments further.  *See Hausknecht v. John Hancock Life Ins. Co. of N.Y.*, 614 F. Supp. 3d 168, 186 (E.D. Pa. 2022) ("In making an argument, a party must offer some argument or development of its theory, cite relevant precedents, and frame the issue for decision.  This Court's role is not to craft arguments for the parties, especially those represented by counsel." (cleaned up)).

perform her job as an occupational therapist without significant pain and weakness during use of her right arm." (Odgers's Rpt. at 5.) Because there are disputes of fact in the record as to the cause of Bloom's lost earning capacity, summary judgment is inappropriate.

*      *      *

Drive's motion for summary judgment on Bloom's request for lost earnings and lost earning capacity is denied.[20]

## V.    CONCLUSION

For the reasons discussed above, Drive's motions to exclude and motion for summary judgment are denied. An appropriate order follows.

---

[20] In Bloom's opposition brief, she suggests that any recovery for lost earnings in this case may be subject to an offset for the lost wages that she received under the C&R in the worker's compensation proceeding. (Doc. No. 44-1 at 23–24.) Because Drive has not asked for an offset, the Court defers ruling on this issue until it is fully argued.